IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No.  08 CR 629 |
| | ) | |
| SHARIFF MILLER | ) | Judge Virginia M. Kendall |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

*Pro se* Defendant Shariff Miller filed the following Pretrial Motions: (1) Motion for a *Franks* hearing; (2) Motion to Dismiss Count III of the Indictment against him charging him with possessing a firearm in connection with a drug trafficking crime pursuant to 18 U.S.C. § 924(c); (3) Motion for Disclosure of Confidential Informer; (4) Motion to Suppress Evidence and to Order an Evidentiary Hearing; (5) Motion to Dismiss the Indictment on Grounds of Prosecutorial, Government and Local Officer Misconduct; and (6) Motion to Compel Production of Grand Jury Material.[1]

## BACKGROUND

### I.      General Procedural Background

On May 26, 2009, a jury convicted Miller of possession with intent to distribute five grams or more of crack cocaine in violation of 21 U.S.C. § 841(a)(1) (Count I), possession of a firearm by a felon in violation of 18 U.S.C. § 922(g)(1) (Count II), and possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A) (Count III). (Dkt.

---

[1]  Miller also filed a Motion for Impeaching Matter (Dkt. 251) and a Brady Motion Pertaining to Favorable Evidence (Dkt. 253.)  On May 15, 2013, the Court orally denied those motions as moot based on the government's affirmation that it recognizes and continues to comply with its continuing obligation to produce any exculpatory evidence, including impeachment evidence.  The Court has also addressed separately Miller's Motion for Appointment of a Private Investigator. (Dkts. 272, 283.)

76.)    On December 22, 2010, this Court sentenced Miller to a total prison term of 20 years. (Dkt. 145.)

Miller appealed his conviction to the United States Court of Appeals for the Seventh Circuit and raised three issues.    First, Miller argued that the search warrant that led to his arrest was issued without probable case because it was based solely upon uncorroborated information supplied by an informant of unknown reliability. *United States v. Miller*, 673 F.3d 688, 692 (7th Cir. 2012).    Second, Miller objected to the introduction at trial of evidence that he had possessed, two months before his arrest, the same pistol the police found in the search. *Id.* Third, Miller asserted that the prosecution's use of the details of Miller's 2000 conviction for felony possession of cocaine with intent to distribute violated Federal Rule of Evidence 404(b) and that this Court erred in admitting that evidence at trial.

The Seventh Circuit rejected Miller's first two arguments, finding that the Court did not err by denying Miller's motion to suppress "because the officers executed the warrant in good-faith reliance on its issuance by the state court" and that the testimony regarding Miller's prior possession of the same pistol was circumstantial evidence of the charged crime, not improper propensity evidence. *Id.* at 693–696.    However, with respect to Miller's third basis for appeal, the Seventh Circuit found that the Court abused its discretion by allowing the government to present evidence of Miller's 2000 conviction. *Id.* at 696–702.    The court concluded that the "only purpose for which [the evidence] could have been used by the jury … was to draw an impermissible propensity inference" and thus the prejudicial effect of admitting the prior conviction substantially outweighed its probative value. *Id.* at 696.    The Seventh Circuit reversed Miller's conviction on the charge of possessing crack cocaine with intent to distribute and on the related charge of possessing a firearm in furtherance of a drug trafficking

crime (Counts I and III). *Id.* at 692. The court affirmed Miller's conviction for being a felon in possession of firearms (Count II), finding that the conviction was supported by separate evidence and was not tainted by the impermissible propensity evidence. *Id.* The case was subsequently remanded to this Court for a new trial on Counts I and III and for re-sentencing on the felon-in-possession charge. *Id.*

## II.     Miller's *Pro Se* Status

The Court has gone to unprecedented lengths in this case to arm Miller with adequate legal representation for his criminal trial. Since the Government issued its indictment on August 8, 2008, Miller has enjoyed the representation of eight different attorneys, seven of which were appointed by this Court from either the Federal Defender Program or the federal criminal trial bar pursuant to the Criminal Justice Act, 18 U.S.C. § 3006, *et seq.* However, due to Miller's inability to take the advice of his trained counsel and his paranoia that every single one of his criminal defense attorneys was aiding the prosecution behind his back, Miller has either fired or forced each of his Court-appointed attorneys to withdraw based on ethical conflicts. Thus, despite the Court's best efforts, Miller has, through his conduct, waived his Sixth Amendment right counsel and chosen to represent himself at trial. Due to the practical perils and legal implications that follow a criminal defendant's decision to proceed to trial *pro se*, the Court takes this opportunity to review in detail the history of Miller's legal representation in this case.

### A.     Miller's Representation Prior to Remand

On August 8, 2008, Miller appeared before the Court for the first time after his arrest. (Dkt. 3.) At his initial hearing, the Court informed Miller of his rights and appointed Robert Seeder, an attorney from the Federal Defender Program. (Dkts. 3–4.) On September 16, 2008,

Mr. Seeder presented an oral motion to withdraw as Miller's attorney due to differences he was having with Miller over how quickly he would be able to bring the case to trial. (*See* Transcript from September 9, 2008 Status Hearing.)   The Court granted Mr. Seeder's oral Motion to Withdraw and rescheduled Miller's arraignment for the following day. (Dkt. 11.)

On September 17, 2008, Kent R. Carlson, a federal panel attorney, was appointed to represent Miller and appeared with Miller at his arraignment. (Dkt. 13.)   A little over four months later, on January 21, 2009, Mr. Carlson filed a motion for leave to withdraw his appearance as Miller's counsel. (Dkt. 29.)   Mr. Carlson represented to the Court that Miller wanted him to withdraw because he was unhappy with the fact that the Court had not yet ruled on Miller's then-pending Motion to Suppress Evidence. (*Id.* ¶ 5.)   Mr. Carlson made clear that he was "filing this motion solely at SHARIFF MILLER'S request" and that he was "not seeking himself to withdraw as appointed counsel." (*Id.* ¶ 6.)   The Court held a hearing regarding the motion on January 26, 2009. (Dkt. 32.)   At the hearing, the Court informed Miller that his frustration with the pendency of his Motion to Suppress Evidence had nothing to do with Mr. Carlson's representation. (*See* Transcript of January 26, 2009 Motion Hearing, p. 4.)   The Court explained to Miller that the Motion remained pending because the Court was still in the process of reviewing it and therefore any delay was entirely out of Mr. Carlson's control. (*Id.*)   When asked whether he had any other problems working with Mr. Carlson, Miller stated that Mr. Carlson was "workable" and "seem[ed] like a very good lawyer." (*Id.*)   The Court reminded Miller that he was already proceeding with his second Court-appointed attorney and that it was not normal practice to appoint a third attorney unless he had irreconcilable differences with his current counsel. (*Id.* 7.)   After discussing the matter privately with Mr. Carlson, Miller informed the Court that he was willing to move forward with Mr. Carlson as his attorney. (*Id.* 8.)

The Court issued an order denying Miller's Motion to Suppress Evidence on January 29, 2009. (Dkt. 33.)   Less than one week later, Miller directed Mr. Carlson a second time to file a motion for leave to withdraw his appearance. (Dkt. 34.)   Mr. Carlson informed the Court that he was filing the motion because Miller demanded that his trial take place before the then-scheduled trial date of March 30, 2009. (*Id.* ¶ 5.)   Mr. Carlson stated that he had advised Miller that he would be unable to go to trial before March 30 due to a four-to-six week criminal trial in his schedule that was set to begin in mid-February. (*Id.* ¶ 6.)   Mr. Carlson also stated that he had advised Miller that the speedy trial clock on his case was not set to expire until April 30, 2009 and that even if he were able to go to trial before March 30, there was no guarantee that the Court would also be able to accommodate an earlier date. (*Id.* ¶¶ 7–8.)   As with his previous Motion to Withdraw, Mr. Carlson informed the Court that he was filing the motion solely at Miller's request and that he was "not himself seeking to withdraw as appointed counsel." (*Id.* ¶ 11.)

Separately, Miller filed a *pro se* letter for appointment of new counsel. (Dkts. 37–38.) In that letter Miller stated that Mr. Carlson (1) was "not an effective and competent attorney"; (2) lied to him and never did what Miller asked of him; and (3) "poorly put together [Miller's] Motion to Suppress." (*Id.* ¶¶ 1–2, 5.)   Miller also expressed frustration regarding his disagreement with Mr. Carlson over how quickly the case should go to trial. (*Id.* ¶ 3.)   Miller added that he was discouraged by and did not "feel safe" with Mr. Carlson's representation. (*Id.* ¶¶ 5–6.)

The Court held a hearing to address the Motion and Miller's letter on February 11, 2009. Miller reiterated his dissatisfaction with Mr. Carlson's work on his Motion to Suppress Evidence and stated that he felt that Mr. Carlson was lying to him about matters pertaining to his case. (*See*

Transcript from February 11, 2009 Motion Hearing, p. 9.) The Court once again reminded Miller that Mr. Carlson was his second Court-appointed attorney and informed him that a third attorney would likely request a trial date after March 30, 2009. (*Id.* 10.) Miller stated that he would accept a later trial date if it meant that he could work with another attorney. (*Id.* 10–11.) The Court granted Mr. Carlson's Motion to Withdraw based on irreconcilable differences and ordered that another attorney be appointed to represent Miller. (*Id.* 12.) At the conclusion of the hearing, the Court warned Miller that this would be the last time the Court would appoint a new attorney to represent him. (*Id.* 12.)

Miller's third Court-appointed attorney, John M. Beal, filed his appearance on February 18, 2009. Mr. Beal represented Miller through his pre-trial, trial, and post-trial proceedings. (Dkts. 39–125.) On May 13, 2010, after his conviction but before sentencing, Miller informed the Court that he wanted another attorney appointed to represent him due to a disagreement with Mr. Beal regarding his sentencing proceedings. (*See* Transcript from May 13, 2010 Hearing.) Despite its own view that Mr. Beal had done an outstanding job representing Miller, the Court asked Mr. Beal to withdraw and ordered that the Federal Defender Program appoint new counsel for Miller's sentencing. (*Id*; Dkt. 126.) One week later, Linda M. Babich filed an appearance on behalf of Miller. (Dkt. 128.) Ms. Babich represented Miller during his sentencing and filed a Notice of Appeal on his behalf following the entry of Judgment. (Dkt. 141.)

**B.      Miller's Representation Following Remand**

On June 8, 2012, following the Seventh Circuit Court of Appeals' remand for a new trial on Counts I and III, attorney Joshua Adams filed an appearance on Miller's behalf. (Dkt. 192.) Mr. Adams was the fifth attorney appointed to represent Miller in his proceedings before the District Court. His tenure as Miller's attorney, however, would be short-lived. On July 26,

2012, Miller submitted an oral request to have Mr. Adams withdraw as his attorney on the basis that Mr. Adams refused to file the motions Miller wanted filed on his behalf. (*See* Transcript of July 26, 2012 Motion Hearing.) The Court reminded Miller that Mr. Adams was the sixth lawyer to represent him in this case and warned that although he had a right to a lawyer, he did not have a right to the lawyer of his choice.[2] (*Id.*) The Court then asked Mr. Adams whether he would be able to continue to represent Miller. (*Id.*) Mr. Adams informed the Court he could not in good faith file the motions Miller sought to present to the Court and thus could not serve as Miller's counsel in this matter. (*Id.*) Once again, the Court accommodated Miller's request and granted the oral motion to have Mr. Adams's withdraw from the case. (*Id.*) The Court informed Miller that it would appoint his "seventh and final attorney" and warned that if he disagreed with his new attorney's advice, he would be forced to represent himself. (*Id.*) Miller responded, "I understand that. If I don't work then I have to go *pro se*. I mean you gave me my warning you told me and I understand." (*Id.*)

Charles J. Aron filed his appearance on behalf of Miller on July 29, 2012. (Dkt. 209.) Mr. Aron would be Miller's seventh attorney in this case and sixth attorney in his District Court proceedings. On November 19, 2012, less than four months after filing his appearance, Mr. Aron filed a motion to withdraw, stating that his relationship with Miller had deteriorated to the point where he could no longer provide representation in this case. (Dkt. 229, ¶ 6.) On November 28, 2012, the parties appeared before the Court for a hearing on the motion. (*See* Transcript from November 28, 2012 Motion Hearing.) Like Mr. Adams before him, Mr. Aron represented to the Court that he could no longer serve as Miller's counsel because Miller wanted him to file certain motions that he could not file in light of his ethical obligations to the Court.

---

[2] This includes a separate team of lawyers that represented Miller during his appeal before the Seventh Circuit.

(*Id.*)

The Court granted Mr. Aron's motion to withdraw and informed Miller he would need to move forward *pro se* due to his inability to work with his previous attorneys. (*Id.*)   However, in an effort to allow Miller to have some form of legal assistance without placing a member of the defense bar in an ethical bind, the Court proposed to Mr. Aron the possibility of remaining in the case as Miller's standby counsel. (*Id.*)   Mr. Aron agreed to appear in a standby capacity but informed the Court that he would not file any motions on Miller's behalf that he found "ethically inappropriate." (*Id.*)   Miller initially rejected the Court's offer, insisting that he be appointed a different standby counsel that felt the same way he did about certain jurisdictional and constitutional challenges he intended to bring to the Court's attention. (*Id.*)   The Court explained to Miller that his lawyers were officers of the Court and had an ethical obligation to refrain from filing motions that were without a factual or legal basis or otherwise frivolous. (*Id.*) Miller insisted that his challenges were not frivolous but based on the Fourth, Fifth, Sixth, Ninth, Tenth, and Fourteenth Amendments of the United States Constitution. (*Id.*)   The Court informed Miller that it had never in its history given a defendant seven attorneys and reminded him once again that he did not have a right to a lawyer of his choice. (*Id.*)   The Court explained to Miller that he could either move forward with Mr. Aron as his standby counsel or he could represent himself. (*Id.*)   Miller chose neither option and instead requested that the Court appoint an eighth attorney to represent him in a standby capacity. (*Id.*)   The Court took Mr. Aron's Motion to Withdraw under advisement and continued the hearing to December 12, 2012. (*Id.*)

At the December 12 hearing, the Court again asked Miller whether he would be willing to work with Mr. Aron as his standby counsel. (*See* Transcript from December 12, 2012 Motion Hearing.)   Miller reiterated that he wanted a standby attorney who would help him argue the

constitutional and jurisdictional issues he felt needed to be brought to the Court's attention. (*Id.*)

The Court reminded Miller of its July 26, 2013 warning:

> [B]ack on July 26th when I appointed you your seventh attorney, I stated the following:
>
> "Mr. Miller, you will have your 7th and final attorney appointed to try the case with you. If you disagree with that attorney's advice, you're on your own. And you're going to have to *pro se* case. You are not going to have any attorney represent you. I have given you seven attorneys to work with."
>
> And you responded, "Can you give me an attorney that's not in the same building with them? It seemed most like every attorney that I had is all from – they are all in one big office."
>
> I responded "Mr. Miller you don't have any attorney of your choice unless you want to pay for one."
>
> And you said "I – if I had the money, I would."
>
> I responded "You don't. And so I've given you six very competent attorneys. They are not from the same firm. They work in a building and there's lots of defense attorneys in that same building. Does not mean that they're working together. No one is conspiring here. So I'm going to give you an attorney and listen this is very firm if you cannot work with this attorney, I will recuse that attorney and I will allow that attorney to go on and will allow that attorney to withdraw and then you are on your own."
>
> And you responded "I understand that. If it don't work, then I'll have to go *pro se*. I mean you gave me my warning, you told me, and I understand."
>
> And then I said "I gave you your warning and I gave you six prior attorneys, and you said I understand."

(*Id.*) (reading from Transcript of July 26, 2013 Motion Hearing) (quotation marks added).

Based on its July 26 warning and Miller's continued refusal to work with his attorneys, the Court determined that Miller, through his conduct, had waived his right to legal representation. (*Id.*) In so holding, the Court relied upon the Seventh Circuit Court of Appeals' decision in *United States v. Oreye*, 263 F.3d 669 (7th Cir. 2001). (*Id.*) In that case, Petitioner

James Oreye appealed his conviction by a jury of federal drug offenses on the basis that his Sixth Amendment right to counsel had been violated when the district court refused provide him a third court-appointed attorney after he was unable to work with his first two court-appointed lawyers. *Id.* at 670.

Shortly after his arraignment, Oreye had expressed dissatisfaction with his court-appointed lawyer because the lawyer did not share in his view that the indictment against him was defective. *Id.* The district court allowed the first attorney to withdraw and appointed Oreye a second attorney. *Id.* Six days before Oreye's trial was set to begin, Oreye's second attorney filed a motion to withdraw on the basis that his client refused to cooperate with him. *Id.* The attorney made it clear that "he had filed the motion to withdraw only because Oreye and he had an irreconcilable difference of opinion over how to conduct the case …." *Id.* After deciding that further delay in the proceedings would be prejudicial to Oreye's co-defendants, who were to be tried with him, the district court gave Oreye a choice between (1) keeping his second attorney, (2) finding another lawyer who would be ready to go to trial on schedule, and (3) representing himself. *Id.* The court informed Oreye that "if he dismissed his attorney and didn't find a substitute at his own expense, he would have to proceed pro se." *Id.* The court also informed Oreye that in the event he chose to move forward *pro se*, it would appoint his second attorney as standby counsel. *Id.* Oreye proceeded to trial as a *pro se* criminal defendant with standby counsel and was convicted. *Id.*

Following his conviction, Oreye appealed to the Seventh Circuit Court of Appeals and arguing that his Sixth Amendment right to counsel was violated when the district court decided not to provide him with a third court-appointed attorney. *Id.* at 670–71. In support of this position, Oreye pointed to the fact that he had never explicitly stated that he wanted move

forward with his case *pro se*. *Id.* The court disagreed, finding that "a defendant can waive his right to counsel through conduct as well as words." *Id.* at 670 (citing *United States v. Irorere*, 228 F.3d 816, 827–28 (7th Cir. 2000), *United States v. Harris*, 2 F.3d 1452, 1454–55 (7th Cir. 1993), and *United States v. Fazzini*, 871 F.2d 635, 641–42 (7th Cir. 1989)). In assessing the three-choice ultimatum the district court gave Oreye before his trial, the court found that "[a]s a matter of both logic and of common sense … if a person is offered a choice between three things and says 'no' to the first and the second, he's chosen the third even if he stands mute when asked whether the third is indeed a choice. This is provided the offer is clear." *Id.* at 670–71 (citing *Cain v. Peters*, 972 F.2d 748, 750 (7th Cir. 1992)). The court also rejected the defendant's argument that the district court should have appointed a third lawyer to represent him, finding that "[a] defendant has no right to indefinite delays while he tries on new lawyers unless he has a reason for dissatisfaction with the old." *Id.* at 671 (citing *Irorere*, 228 F.3d at 827–28, *Harris*, 2 F.3d at 1454–55, and *Fazzini*, 871 F.2d at 641–42). The court determined that the defendant had "no good reason" to be dissatisfied with his first two attorneys. *Id.* Thus, "[g]iven the fact that an indigent defendant has a right to competent counsel but not a right to counsel of his choice," the court held that the "[district court] judge was fully within his rights in refusing to appoint a third lawyer for Oreye." *Id.* (internal citations omitted).

In addressing the adequacy of the district court's warnings to Oreye regarding the perils of self-representation, the Seventh Circuit stated that a "judge placed in [the district court judge's] position is on the razor's edge in assisting a defendant to make an informed choice between representation by counsel with whom the defendant is irrationally dissatisfied and self-representation. If the judge exaggerates either the advantages of being represented or the disadvantages of self-representation, he will be accused of having put his thumb on the scale and

prevented the defendant from making an informed choice." *Id.* at 672. Recognizing the trial court's dilemma, the Court of Appeals found that by mentioning the difficulties of self-representation on two occasions and pointing out to Oreye that he was unfamiliar with trial procedures and legal procedures, the district court's warnings were adequate and satisfied the standard set forth in *United States v. Hill*, 252 F.3d 919 (7th Cir. 2001). *Id.* at 672; *see also Hill*, 252 F.3d at 928–29 ("All a judge can do as a practical matter—all a judge need do as a legal matter—is ensure that the defendant knows his rights and avoids hasty decision .... Section 1654 and *Faretta* require courts to respect a litigant's demand for self-determination at the most critical moment in the criminal process. That right is not honored if judges must depict self-representation in such unremittingly scary terms that any reasonable person would refuse.").

Accordingly, in this case the Court informed Miller that it would not provide new legal representation and would instead appoint a different individual to act as standby counsel for his trial. (*See* Transcript from December 12, 2012 Motion Hearing.) Miller expressed at length his frustration with this arrangement:

> Okay. So I don't understand why he would refuse himself if – why he would withdraw I mean according to the Constitution I have a right to an attorney to adequate defense for my – for my trial and he's withdrawing. The first – the first attorney that I had withdrew because I asked for a speedy trial. I'm not asking these lawyers to withdraw. Out of the eight four have withdrew on their own, not because of … me not wanting them as my attorney. I don't understand why they withdrawing. You see what I'm saying? All I know is my constitutional right, I have a right to an attorney, to go trial and now you giving me stand-by counsel, you see what I'm saying? All I'm trying to do is have an adequate defense. Only thing I'm asking to argue are … legitimate arguments, I don't' know why they withdrawn, I don't know why they doing what they doing I'm asking them to do things for me in my defense …. I don't know why they not arguing how I'm asking to argue and that's where the problem is coming in at, after they argue it they don't argue it right, they persuade me that they arguing it right and it comes back not right because you denying it and then it's not being said how I'm asking for it to be said so I don't know how to go about it no other way of getting it said than going pro se but all I know is that the Constitution guarantees me an attorney, Constitution guarantees me to be secure, Constitution

guarantees me the Fourth Amendment Fifth Amendment due process as well life and liberty so I don't understand how I'm not – I don't understand how I don't have a right to an attorney. You see what I'm saying? Four quit on me and I did not ask them to quit and then the other four they filed paperworks ineffective, inefficiently because they did not argue it right. I had a motion to suppress that you denied through the mail, you see what I'm saying? I never … had a hearing and every officer that's on my case has been fired, been resigned but everything was in good faith for these officers. I don't' how understand how it's in good faith these officers that are no longer officers for misconduct that they didn't conduct it in they duties do you see what I'm saying.

(*Id.*) The Court proceeded to address each of Miller's questions:

Number one, you do have a right to have a counsel. You do not have a right to have the counsel of your choice. You have had seven highly competent attorneys represent you over the course of your case. All them are trained in the law and you are not.

Number two, those lawyers have an obligation to this Court to only present legally sufficient arguments that are based in fact and law. They must rely on their experience and their training and only to present those that are valid. If they do not believe they are valid, they are violating their oath of office as an officer of this Court and they may not bring what they believe is an improper motion, which is why your attorneys continue to withdraw, because you want them to do something that they do not believe is a valid motion under the facts and the law.

Number three, as you move forward, you may bring those motions because that is what you want. You don't believe they are right …. [Y]ou don't believe that the seven law degrees that came before you know what they're doing. You have the right now as a *pro se* person to present those issues to me and I will apply the law to the facts.

Number four, I did not grant the motion to suppress because based on the filings presented to me, you were not entitled to a hearing. You are only entitled to a hearing when facts are in dispute such that a factual dispute requires me to hear evidence from a hearing. I made a determination under the law that no such hearing was required.

Number five, you are still required – or you're still permitted to reraise that issue now that you're on your own. Which is what I think you'll be doing.

And finally, I will get an attorney that will be a stand-by counsel that you can consult with, but he … or she will not be filing on your behalf. Everything will have to come directly from you. All of this is because you refuse to accept the advice of your counsel. The way that it works in this courtroom is that the

> lawyers who understand the law advise their clients and they do so in the best of their ability. Since you won't accept their advice, they are put in a position like Mr. Aron who comes to me to say "I cannot file what he wants me to file. I need to withdraw." And that's why you're in the position you're in. So now you'll be able to file what you want to file.

(*Id.*) At the conclusion of the hearing, the Court granted Mr. Aron's Motion to Withdraw and ordered the appointment of standby counsel for Miller's trial. (*Id*; Dkt. 236.)

On January 8, 2013, Miller's seventh Court-appointed attorney, Gary Ravitz, filed his appearance in this case. (Dkt. 239.) Mr. Ravitz came before the Court on January 9, 2013 and stated that he had met with Miller and had gained a clearer sense of the type of legal representation-arrangement Miller wanted for his case. (*See* Transcript from January 9, 2013 Status Hearing.) Mr. Ravitz explained that what Miller essentially wanted was a form of "hybrid representation" that would enable him to have a lawyer to "do things that he may not feel confident or capable of doing" but also "tell the lawyer what to do." (*Id.*) Mr. Ravitz stated that he had not seen a circumstance where a defendant was permitted to file his own motions and also have a lawyer represent him. (*Id.*) Asked whether he would be able to either represent Miller or serve as his standby counsel, Mr. Ravitz stated he would be willing to represent Miller in any capacity the Court, Miller, and his ethical obligations would allow. (*Id.*) Mr. Ravitz warned, however, that based upon his understanding of Miller's perspective on how the case should move forward, he anticipated that there would be a conflict between himself and Miller over the types of motions that should be filed. (*Id.*) Miller, for his part, reiterated that the Constitution guaranteed him the right to counsel and added, "I object to being *pro se*. I am not an attorney." (*Id.*) The Court ordered that both the Government and Mr. Ravitz file position papers regarding the legal and practical viability the type of "hybrid representation" Miller sought. (Dkt. 240.)

After reviewing both counsels' position papers, the Court determined that Miller would not be allowed to have it both ways by using hybrid representation. As the Government correctly noted, such an arrangement would have enabled Miller to manipulate pretrial proceedings by allowing him to take advantage of his attorney's legal expertise but at the same time file motions regardless of merit, relevance, or standards of professional conduct. Furthermore, the form of hybrid representation Miller sought would undoubtedly place Mr. Ravitz, as Miller's "co-counsel," in a position of having to assist—either by conducting a fact investigation or legal research—in the presentation of motions that lacked merit in violation of his obligations to the Court.

Given this dilemma, the Court informed Miller on January 23, 2013 that he had three options: (1) represent himself; (2) agree to have Mr. Ravitz represent him; or (3) proceed *pro se* but have Mr. Ravitz as his standby counsel. (*See* Transcript of January 1, 2013 Status Hearing.) The Court explained to Miller that under the third option, he would be able to utilize Mr. Ravitz as a conduit to serve subpoena's and present information from his investigators (in the event an investigator were appointed in his case). (*Id.*) The Court also informed Miller that Mr. Ravitz would sit with him at trial so that Miller could ask him questions about trial procedure. (*Id.*) The Court warned, however, that due to a conflict between Miller's theory of the case and Mr. Ravitz's ethical obligations to the Court, Mr. Ravitz would not examine witnesses or file motions on his behalf. (*Id.*) After hearing this description of the standby-counsel arrangement, Miller informed the Court that he did not want Mr. Ravitz as standby counsel because he did not trust him and because he wanted to speak with his witnesses himself, not through a conduit. (*Id.*) Miller stated that he wanted to personally interview his witnesses but could not do so due to limited phone access at the Metropolitan Correctional Facility ("MCC") where he was (and is

currently) housed awaiting trial. (*Id.*) The Court proceeded to warn Miller about the disadvantages of representing himself:

| | |
|---|---|
| The Court: | I don't think you should represent yourself as I've told, Right? |
| Miller: | I mean – |
| The Court: | I have told you that. |
| Miller: | Yes, you have told me … all the marshals have told me all the MCC officers have told me. |
| The Court: | Okay. |
| Miller: | So I mean it's not that I don't have knowledge that it's in the best of my interest to have an attorney. |
| The Court: | Okay. |
| Miller: | It's that I want an attorney that see my issues as I see them. |
| The Court: | Understood so you know that everyone else has told you that it's not a good idea to represent yourself, Right? |
| Miller: | Yes. |
| The Court: | Okay. And you've also gone through one criminal trial so you know what it's like to have an attorney represent you before a jury. Right? |
| Miller: | Yes. |
| The Court: | And you know that it takes some skill and legal training … to ask the questions appropriately and to cross-examine appropriately. Right? |
| Miller: | Yes. |
| The Court: | And you don't have that training. |
| Miller: | No, I don't. |

(*Id.*) However, because Miller had expressed reservations regarding his ability to access a

phone at the MCC to interview witnesses, the Court, in an abundance of caution, determined that any Sixth Amendment waiver must be contingent upon whether Miller could gain additional access to the phones at the MCC. (*Id.*) Accordingly, the Court ordered that the Government call the MCC legal counsel to see if Miller could gain special access to an MCC telephone free of monetary restrictions. (*Id.*)

Later that afternoon Miller, Mr. Ravitz, Assistant United States Attorney Samuel Cole, and MCC legal counsel Amy Standefrer-Malott appeared before the Court.[3] (*Id.*) The Court asked Ms. Standefrer-Malott whether Miller would have the ability to contact witnesses and other individuals regarding his trial in light of the MCC's limitation on the number of minutes each pretrial detainee is allowed to have. (*Id.*) Ms. Standefrer-Malott informed the Court that it could accommodate Miller in one of two ways. If Miller was represented by an attorney or worked with a standby counsel to prepare for his trial, the MCC could provide Miller additional access to an unmonitored attorney-client phone line. (*Id.*) If on the other hand Miller chose to move forward *pro se*, a special dummy PIN Number would be assigned to him that would enable him to make phone calls directly from his cell. (*Id.*) Ms. Standefrer-Malott also informed the Court that as a *pro se* defendant Miller would be able to file motions with the Court via U.S. Mail, meet with witnesses and his investigator through video conferences, and access an electronic law library to conduct legal research. (*Id.*) Ms. Standefrer-Malott stated that although detainees using the electronic law library normally do not have access to printing capabilities, she would make special arrangements with the MCC's education advisor that so that Miller could obtain the copies he needed. (*Id.*) To ensure that Miller had not misheard anything Ms. Standefrer-Malott said over the telephone conference, the Court provided Miller a summary

---

[3] Ms. Standefrer-Malott appeared telephonically.

of Ms. Standefer-Malott's description of the MCC's accommodations:

> [N]ow that you have all the information in order to make a decision about how you want to proceed, if you proceed *pro se* you have just been informed that you will have telephone access to contact witnesses. That telephone access will be recorded. That you do have access to an investigator, once that investigator is appointed by the Court, and that investigator will talk to you through that videoconferencing program, and that you will have access to [the] law library, the electronic law library, whenever you want, as long as someone else is not using it. And you do have the ability to get copies made of materials. So knowing that those will be the parameters of what can happen while you're at the MCC, is it your desire then to represent yourself in this criminal trial?

(*Id.*)

Miller responded, "Yes, I'm willing to represent myself." (*Id.*) The Court once again reminded Miller that numerous individuals and the Court had advised him against proceeding *pro se* and that he did not have the legal training or knowledge that a lawyer representing him would have. (*Id.*) Miller stated that he understood and that he still wanted to represent himself. (*Id.*) The Court then asked Miller whether he wanted Mr. Ravitz to remain as his standby counsel so that he could turn to him and ask him for guidance regarding investigatory questions, filing questions, and evidentiary issues. (*Id.*) Miller responded, "Yes." The Court reminded Miller that under this arrangement Mr. Ravitz would not direct or cross-examine witnesses and that he would have the sole responsibility of asking questions. (*Id.*) The Court also informed Miller that he would be required to abide by the same rules of procedure and evidence that lawyers are required to follow and that he could look to Mr. Ravitz for guidance regarding such matters. (*Id.*) Miller informed the Court that he understood these terms. (*Id.*) Based upon these representations, the Court determined that Miller had waived his right to counsel and elected to represent himself with the assistance of Mr. Ravitz as standby counsel. (*Id.*) The Court also granted Miller's subsequently filed motion for the appointment of a fact investigator.

(Dkts. 245, 247.)

On February 27, 2013, one month after having Mr. Ravitz appointed as his standby counsel, Miller filed a letter stating that he wanted a different standby attorney due to a conflict of interest with Mr. Ravitz. (Dkt. 249.)  Miller explained that he wanted Mr. Ravitz "replaced with someone who will help me do what I'm trying to do." (*Id*.)  The Court held a status hearing on the matter the same day and informed Miller that he was well beyond the point of having the Court appoint additional attorneys and that he could either work with Mr. Ravitz or move forward *pro se* without standby counsel. (*See* Transcript from February 27, 2013 Status Hearing.)  Neither Mr. Ravitz nor Miller addressed the issue further at the February 27 Status Hearing and Mr. Ravitz remained on board as Miller's standby counsel time being. (*See id.*)

On May 8, 2013 Miller again expressed that he no longer wanted Mr. Ravitz as his standby counsel.[4] (*See* Transcript from May 8, 2013 Status Hearing.)  Miller informed the Court that he had a conflict with Mr. Ravitz and added that he "would like standby counsel but if it's Mr. Gary Ravitz, I would rather be on my own." (*Id.*)  When asked about the nature of the conflict, Miller stated, "The conflict is he's not helping me.  The conflict is I feel he's spying on me taking everything I do to the government.  I feel like he's working with the government. And I don't want him as my counsel." (*Id.*)  Based on these representations, the Court granted Miller's oral motion to unappoint Mr. Ravitz as standby counsel. (Dkt. 269.)

On May 15, 2013, Miller appeared before the Court for a status hearing and objected to proceeding *pro se* under the restrictions imposed on him at the MCC for abusing his special phone privileges. (*See* Transcript from May 15, 2013 Status Hearing.)  This led to the following

---

[4]  The Court also held a status hearing on March 6, 2013 to discuss Miller's abuse of his special phone privileges at the MCC. (*See* Transcript from March 6, 2013 Status Hearing.)  Miller's representation was not substantively discussed at the March 6 hearing. (*Id.*)

exchange:

> The Court: You said you don't want to go *pro se* under these – under these circumstances. And I'm telling you the circumstances that you have are all of your own doing. You cannot get an eighth attorney, Mr. Miller. You won't work with an attorney. You have effectively waived having an attorney by your refusal to work with every single individual that the Court has provided to you.

> Miller: I understand that your Honor and I do not have a problem with continue to go *pro se* fully due to the fact that all the attorneys I believe I have had has worked with the government and has not been in my best interest and not have been pertaining to – I mean not have been presenting my defense the way that I feel they should and I don't – I don't mind going *pro se*. I believe that I would represent myself better than they will due to the fact that they are working with the government.

> The Court: All right. You do understand though that the lawyers that I had assigned to you and the standby counsel that I had given you, they studied the law so they are aware of how to file motions and they know how to research the law and you, although you saw you understand better than they, you don't have any training in the law, Right?

> Miller: Your Honor, I never spoke of understanding better than they. I said I would represent myself better than they are representing me. I'm sure they went to school for all these vast years and I'm sure they earned their degrees but that do not mean they ain't working with the government to sabotage my case and clean up government corruption that I been trying to present to the Court.

> The Court: Okay. You understand that the crime you've been charged with that we're going to trial on, do you know what the maximum penalty is for that charge, the drug charge that is going back to trial?

(*Id.*) The Government then informed Miller that he faced a statutory maximum sentence of life in prison if convicted under 18 U.S.C. § 924(c). (*Id.*) After Miller was informed of the penalties he might face if convicted, the colloquy continued:

> The Court: Okay. All right. Those are the maximum penalties. So you're facing a sentence that is significant and you're doing so without the help of a lawyer because you don't think that the lawyers have

|  |  |
|---|---|
| | your best interest.    Is that my understanding? |
| Miller: | Yes, your Honor. |
| The Court: | Okay.    So you are aware that that is a significant penalty that you could be facing without the help of the lawyer, right? |
| Miller: | Your Honor, if I'm sentenced to excessive time for representing myself, I believe whatever statute that is, your Honor, I guess I'm entitled to receive the excessive time but I don't' believe there's a statute that say I deserve more time for representing myself.    I went to trial, I lost, you sentenced me to 20 years, your Honor.  I'm back on appeal.    My 841 has been reversed and my 924(c) has been reversed.    If you give me more time than the 20 years, your Honor, that I was already sentenced to for representing myself, I mean, that is just – that is just be a appeal issue I will have to deal with if I so happen to lose but my objective is producing corruption that I know exists, the informant do not exist and what they do to Chandra Borko and Maureen Washington they done to anybody else and they are any means approach unlawful approaches and they do not respect the law. |
| The Court: | Okay.    Well, let's just correct one of the misstatements you've said twice which is that you would be facing more time because you're representing yourself or that the Court would be so arbitrary and impartial – or rather partial to sentence you based upon representing yourself.    Both of those are falsehoods.    You're not facing any more time based upon representing yourself nor is the Court going to take into account that you're representing yourself at the time of sentencing.    You have the right to do that if you want to do that and you're expressing to me today that that's what you want to do.    So let me just correct that misstatement of the law on the record.    Do you understand that, that there's no penalty for representing yourself. |
| Miller: | I pray there's not, your Honor. |
| The Court: | Okay.    And then do you understand that – well, let's step back for a moment.    You've already had one jury trial and you were … represented at that time and you sat through the jury trial and the process so you know how this will happen.    You know that witnesses will be called and that you will be required to cross-examine the witnesses if you want. |
| Miller: | I understand the procedure. |

| | |
|---|---|
| The Court: | Okay. And then you can put in your own evidence through the investigator if you want or if he provides you with information, you can use that information. You understand that, right? |
| Miller: | Yes, I understand. |
| The Court: | So even though you don't have a law degree you've actually sat through at least one criminal trial, right? |
| Miller: | Yes, your Honor. |
| The Court: | That one. And is there any other exposure that you've had to the courtroom proceedings other than the criminal trial that you had in front of me? |
| Miller: | I mean, your Honor all I do is just study as I can with the sources that I have and will present my defense to the best of my ability. |
| The Court: | Okay. My question is a little different. Have you been in another courtroom or had any other Court proceedings? |
| Miller: | No, your Honor. |
| The Court: | Okay. All right. So how long was the first trial? About a week, right? |
| Prosecutor: | A week, maybe a little more. |
| The Court: | Okay. Just so we put on the record that you do understand the procedure of how the trial will take place and, of course, how my procedures will be as far as the courtroom is concerned so you understand what the procedures are from hat previous trial, Correct? |
| Miller: | I understand, your Honor. |
| The Court: | Okay. So I just need to advise you again that in my opinion a trained lawyer would defend you far better than you would defend yourself which is why I've given you so many of them so I want to hear from you directly that you voluntarily do not want those lawyers because you do not believe that they represent you accurately. |
| Miller: | Your Honor, I would like a lawyer that represent me accurately in my best interest, that's what I would like. However, the lawyers that I have had have been ineffective and not in my best interest. |

22

(*Id.*)

Based on this exchange and on Miller's inability to work toward trial with his previous seven Court-appointed attorneys, the Court determined that Miller knowingly and voluntarily waived his right to counsel and would move forward as a *pro se* criminal defendant. (*Id.*)

## DISCUSSION

### I.     Search Warrant-Related Motions (Dkts. 250, 257)

Miller has filed two separate but partially overlapping motions challenging the search warrant that led to his arrest.   First, Miller moves to suppress all narcotics, firearms, and other physical evidence seized at the residence on the basis that the warrant was executed at the incorrect time and lacked probable cause.   Second, Miller seeks a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), to determine whether the search warrant was issued without probable cause.   In both motions, Miller argues that the warrant was based on false testimony provided by a confidential informant and Detective Louis Rivera, who submitted an affidavit supporting the request for the search warrant.

### A.     The Law-of-the-Case Doctrine

The law of the case doctrine requires this Court "to confine its discussion [at trial] to the issues remanded." *United States v. Morris*, 259 F.3d 894 (7th Cir. 2001).   To determine the scope of the issues that are subject to the remand mandate, courts must eliminate issues that have been either "waived or decided." *United States v. Husband*, 312 F.3d 247, 250 (7th Cir. 2002). Thus, "once an appellate court either expressly or by necessary implication decides an issue, the decision will be binding upon all subsequent proceedings in the same case." *Key v. Sullivan*, 925 F.2d 1056, 1060 (7th Cir. 1991).   In addition, "any issue that could have but was not raised on

appeal is waived and thus not remanded." *Husband*, 312 F.3d at 250 (citing *Morris*, 259 F.3d at 898) ("[P]arties cannot use the accident of remand as an opportunity to reopen waived issues."). However issues that "arise anew on remand are generally within the scope of the remand." *Id.* at 251 n.4 (citing *Morris*, 259 F.3d at 898).

In this case, Miller argued on appeal that the search warrant was issued without probable case because it was based on uncorroborated information from an informant of unknown reliability. *Miller*, 673 F.3d at 692. While the reviewing court did not address whether the warrant was supported by probable cause, the court found that the officers who executed the search warrant reasonably relied on it in good faith and therefore the evidence seized in executing the warrant should not be suppressed pursuant to *United States v. Leon*, 468 U.S. 897 (1984). *Id.* at 693. The court reasoned that "[t]he affidavit included enough detail that a reasonable officer might rely on the judge's issuance of a warrant based on it. Although the details were generic, they also were recent, were based on firsthand observation, and were likely against the informant's penal interest." *Id.* at 694. Thus, because the appellate court has already addressed Miller's challenge to the search warrant and found the search valid, any challenge to the validity of the warrant on remand is closed to the defendant under the law-of-the-case doctrine. Additionally, to the extent Miller seeks to raise new issues regarding the search warrant that he could have raised on appeal—i.e., the timing of the execution of the warrant—those issues are waived. *See Husband*, 312 F.3d at 250–51 (defendant's challenge to validity of search warrant was beyond the scope of remand under law-of-the-case doctrine because defendant had challenged only the method of the search during his first appeal and not the validity of the search warrant).

## B.       Motion to Suppress Evidence

Even if Miller's search warrant-related challenges were not waived, they lack merit. First, as the Court has already found in this case, the information supplied by the confidential informant and subsequently conveyed in Officer Rivera's affidavit was sufficient to establish probable cause for the issuance of a search warrant.   An affidavit submitted in support of an application for a search warrant establishes probable cause if the affidavit sets forth sufficient facts to cause a reasonable person to believe that a search will uncover contraband or evidence of a crime based on the totality of the circumstances. *See United States v. Sidwell*, 440 F.3d 865, 868 (7th Cir. 2006).   In reviewing whether the facts sufficiently established probable cause to justify the issuance of a warrant, courts give "great deference to the conclusion of the judge who initially issued the warrant." *United States v. Garcia*, 528 F.3d 481, 485 (7th Cir. 2008); *see also United States v. McIntire*, 516 F.3d 576, 578 (7th Cir. 2008).   An informant's reliability is determined based on the totality of the circumstances, an inquiry that includes: "(1) the extent to which the police have corroborated the informant's statements; (2) the degree to which the informant has acquired knowledge of the events through firsthand knowledge; (3) the amount of detail provided; and (4) the interval between the date of the events and the police officer's application for the search warrant." *United States v. Sims*, 551 F.3d 640, 644 (7th Cir. 2008).

In this case, the affidavit demonstrates that the informant's knowledge regarding the presence of drugs within Miller's residence was based on firsthand observation.   The affidavit stated that the confidential informant had seen four "larger plastic bags containing several smaller plastic baggies each with an amount of a white rock-like substance," knew the substance was consistent with the "look, packaging and texture of Cocaine" based on the fact that he had seen cocaine over a hundred times before, and had seen cocaine in the same residence on a few

occasions over the last month. *See Miller*, 673 F.3d at 694. Additionally, Officer Rivera's application for the warrant was submitted in close temporal proximity (within 72 hours) of the last time the informant had been inside the residence. *Id.* Lastly, the informant appeared in court to testify, giving the judge who reviewed the search warrant the opportunity to meet the informant and assess his credibility prior to making the probable cause determination. As the Court stated previously, "[w]hen an anonymous source's affidavit contains minimal detail, probable cause can be established if the affidavit includes information based on the source's recent first-hand observations, if the affidavit sets forth the basis of the source's knowledge and if the source appears before the judge making the probable cause determination." *United States v. Miller*, No. 08 CR 629, Dkt. 33; *see also United States v. Garcia*, 528 F.3d 481, 485 (7th Cir. 2008) (though affidavit lacked many details, probable cause to issue warrant existed where informant stated he had observed a substance he believed to be cocaine packaged in a plastic bag inside the apartment in question within the past 72 hours and the affidavit stated that he believed the substance was cocaine based on his own involvement in selling cocaine in the past); *United States v. Johnson*, 289 F.3d 1034, 1039–40 (7th Cir. 2002) (although confidential informant did not provide detail or specificity, his first-hand observations of criminal activity inside the defendant's house supported a finding of probable cause), *abrogated on other grounds as recognized by United States v. Vaughn*, 433 F.3d 917 (7th Cir. 2006). Given that the informant conveyed recent, mostly firsthand observations, the fact that Officer Rivera did corroborate the informant's statement or indicate whether the informant had provided reliable information in the past does not change the outcome of the analysis in this case. *See United States v. Brack*, 188 F.3d 748, 756 (7th Cir. 1999) ("[A] deficiency in one factor may be compensated for by a strong showing in another or by some other indication of reliability."). Accordingly, the Court finds

that probable cause to search Miller's residence for cocaine existed when the judge issued the search warrant.    Miller's Motion to Suppress is therefore denied.

### C.    Motion for a *Franks* Hearing

In order to obtain a *Franks* hearing, Miller must make a '"substantial preliminary showing" that: (1) the affidavit contained a material false statement; (2) Officer Rivera made the false statement intentionally, or with reckless disregard for the truth; and (3) the false statement was necessary to support the finding of probable cause. *United States v. Smith*, 576 F.3d 762, 765 (7th Cir. 2009) (quoting *United States v. Maro*, 272 F.3d 817, 821 (7th Cir. 2001)); *see also United States v. Schultz*, 586 F.3d 526, 531 (7th Cir. 2009) (the "standard is not whether the affidavit contains a false statement, but whether the affiant knew or should have known that the statement was false").    Here, Miller provides no basis whatsoever for his contention that Officer Rivera made false statements in his affidavit or that such statements were made intentionally or with reckless disregard for the truth.    Instead, Miller simply asserts that he has "substantial reason to believe that the affidavit underlying the search warrant … contains false statements made by the affiant either knowingly and intentionally or with a reckless disregard for the truth." This naked conclusion is insufficient. *See United States v. Johnson*, 580 F.3d 666, 671 (7th Cir. 2009) ("Conclusory, self-serving statements are not enough to obtain a *Franks* hearing."); *United States v. Reed*, 726 F.2d 339, 342 (7th Cir. 1984) ("[T]he *Franks* presumption of validity of an affidavit supporting a search warrant … cannot be overcome by a self-serving statement which purports to refute the affidavit.") (citations omitted).    Furthermore, Miller's misgiving about Officer Rivera's failure obtain more information or corroborate the informant's claim are not sufficient to obtain a *Franks* hearing. *See Johnson*, 580 F.3d at 671 ("That the police could have done more work does not meet the high standard of requiring a *Franks* hearing …. Even if the

police's failure to corroborate the informant's claims was negligent, 'a little negligence—actually even a lot of negligence—does not the need for a *Franks* hearing make.") (citations omitted). Accordingly, Miller's Motion for a *Franks* Hearing is denied.

## II. Motion to Require Government to Reveal Identity of Confidential Informant (Dkts. 254, 282)

Next, Miller requests that the Court order the Government to reveal the identity and address of the confidential informant upon whose information the search warrant was predicated. The Court has already addressed and denied this motion in an Order issued prior to Miller's first trial. (Dkt. 63.) In that Order, the Court found that where, as here, "the confidential informant is a mere 'tipster'—someone whose only role was to provide the police with the relevant information that served as the foundation for obtaining a search warrant—rather than a 'transactional witness' who participated in the crime charged against the defendant or witnessed the event in question, disclosure will not be required." *Id.* (citing *United States v. Harris*, 531 F.3d 507, 515 (7th Cir. 2008)). The Court found no evidence in the record suggesting that the CI in this case had any involvement beyond providing the information that led to the acquisition of the search warrant. (Dkt. No. 63.) On appeal, Miller could have but did not challenge the court's refusal to require the Government to disclose the identity of the confidential informant. Thus Miller's motions pertaining to the disclosure of the informant's identity are waived. Additionally, Miller points to no new evidence suggesting the informant's identity would be relevant and helpful to his defense. Thus, even assuming Miller's motion were within the scope of remand, Miller's Motion for Disclosure of Confidential Informer would be denied for the reasons stated in the Court's previous Order.

In a separate motion titled "Motion for Order," Miller argues that the Government's refusal to disclose the identity and produce for cross-examination the confidential informant violates his Sixth Amendment right to confront his accusers. However, there is no indication that the confidential informant had any involvement in this case beyond providing the information that led to the acquisition of the search warrant. Nor has the Government sought to offer at trial any testimonial statements made by the informant. Miller's Sixth Amendment right to Confrontation is not implicated under these circumstances. *Compare United States v. Holmes*, 620 F.3d 836, 841 (8th Cir. 2010) (admission at trial of statements in search warrant affidavit by non-testifying confidential informant identifying defendant as person selling crack cocaine violated the Confrontation Clause), *with Untied States v.* Mendez, 514 F.3d 1035, 1046 (10th Cir. 2008) (defendant's right to confront his accusers not violated by investigating agent where agent did not testify about statements made to him by the informant), *and United States v. Dunbar*, 104 Fed.Appx. 638, at *1 (9th Cir. 2004) (unpublished) (defendant's Sixth Amendment claim "must fail for the simple reason that no testimonial evidence provided by the confidential informant was ever introduced into evidence. The officer testified that he personally prepared a search warrant for [the defendant]; he mentioned neither the information contained in the warrant application nor its source."). Miller's Motion for Order is therefore denied.

### III.    Motion to Dismiss the Indictment on Grounds of Prosecutorial, Government and Local Officers' Misconduct (Dkt. 258)

Miller also seeks to have the Indictment against him dismissed on the basis that law enforcement officials and prosecutors subjected Chandra Borko, a Government witness, to duress, coercion, threats of imprisonment, and threats that her children would be taken away from her if she did not testify against Miller. Federal Rule of Criminal Procedure 12(b)(2)

provides that the Court may consider at the pretrial stage "any defense, objection, or request that the court can determine without a trial of the general issue." This includes cases where the government has violated the defendant's constitutional rights or has committed constitutional error in the prosecution of an indictment. *See United v. Levin,* 973 F.2d 463, 468 (6th Cir. 1992); *see also United States v. Linder,* No. 12 CR 122, 2013 WL 812382, at *28 (N.D. Ill. Mar. 5, 2013). In addition, federal courts possess an inherent supervisory power and duty to dismiss indictments obtained in violation of the Constitution and the laws of the United States. *See Linder,* 2013 WL 812382, at *26 (collecting cases).

Chandra Borko recently recanted her previous testimony in this case. At trial, Borko testified on direct examination that she observed Miller take "a gun out of his waistband and set it on the kitchen table" at a birthday party in February 2008. (Dkt. 161, p. 45–46.) Borko also identified the gun after it was presented to her as an exhibit and stated that she was "100 percent sure" it was the same gun she saw in February 2008. (*Id.* at 47.) The Government then presented to Borko a letter she received from Miller in September 2008. (*Id.* 51.) The letter stated:

> What's up Chandra? I know you surprised by my letter, but I'm writing to let you know that I'm going to trial on this case. I'm going to need you to come in on my behalf and tell the judge and jury that the police forced you to write a statement or that you didn't write the statement and that the police never gave me a warrant when they came into the house. If you can remember when they had me on the floor in the house, I kept asking them, the police, where is the warrant, and I was never given one. Let Maureen know the same. If y'all can't make it, then we will have to settle for a statement saying what happened. If you asked by anyone where I was staying in the house, let them know the basement. Me and Jessica had no relationship at all and me and my girl, Dominique, rented downstairs. Please don't' forget to keep this letter to remind you if needed, but know that I need you on this.

(*Id.* at 51.) Borko testified that it was her understanding that Miller did not reside in the

basement of the residence but in the upstairs bedroom, that Miller and Jessica were in fact a couple, and that the police never forced her to make a statement against Miller. (*Id.* at 53–54.)

On March 26, 2013, an ATF Special Agent and Assistant United States Attorney interviewed Borko via telephone. (Dkt. 260-1). During that interview, the AUSA informed Borko that she would be subpoenaed to testify at Miller's retrial. (*Id.*) Borko informed the AUSA and ATF Special Agent that "everything she told at trial was true and she wasn't going to say anything different at retrial." (*Id.*) Two weeks later, on April 8, 2013, Borko signed a sworn affidavit in the presence of a notary public and Miller's private investigator, Lawrence Wade.[5] (Dkt. 263, p. 5.) In that affidavit, Borko states that she previously testified against Miller because she was scared after being told by officers at the Waukegan Police Station that she would be arrested and that her children would be taken away from her. (*Id.*) Borko further alleges that before testifying against Miller, she was told by an agent "how to say what needed to be said." (*Id.*) She added, "I was not advised on what to say but I was advised on how to say it." (*Id.*) Borko also asserts in her affidavit that she "received a phone call threatening [her] about testifying for the prosecution." (Dkt. 263, p. 5.) Borko states that she informed agents of the call and was subsequently "given over a thousand dollars to relocate." (Dkt. 263, p. 5.) Borko further asserts that after testifying at trial, she was told she "would be called and paid" but that "[n]o one ever called and she did not receive any more money." (*Id.*)

On May 15, 2013, the Court held a status hearing during which the parties discussed the issues surrounding Chandra Borko's testimony and the allegations that form the basis of Miller's Motion to Dismiss the Indictment. At the status hearing, the Government informed the Court that it spoke with Borko on May 10, 2013 and learned that Borko has recanted her previous trial

---

[5] The first page of the affidavit is dated March 13, 2013, two weeks before Borko's interview with the AUSA and ATF Special Agent. The document does not explain the significance of this date.

testimony that she saw Miller with a firearm. (Tr. 5/15/2013).   The Government added that it was in the process of obtaining counsel for Borko regarding her recanted testimony. (*Id.*)   With respect to the alleged phone calls Borko received in relation to her testimony, the Government offered no information regarding the source of the threat but stated its belief that Borko was threatened after Miller's trial. (*Id.*)   Miller stated that Borko alleges she received a threatening phone call from Miller's brother. (*Id.*)   Lastly, the prosecutor informed the Court that he is unaware of any payments made to Borko but that he had contacted the Lake County housing authority after Borko was threatened to see if she would be able to withdraw from her lease. (*Id.*) The Government also indicated that Borko may have received "some sort of voucher" but that it was unaware of "who she was paid by, if anyone." (*Id.*)

Based upon Miller's motion and his oral representations to the Court, it appears that Miller's Motion to Dismiss the Indictment is predicated on the following allegations relating to Chandra Borko: (1) prosecutors threatened Borko by stating that she would be prosecuted for perjury for recanting her prior testimony; (2) Borko's received $1,300 in exchange for providing false testimony against Miller; and (3) local law enforcement officials threatened Borko by stating they would arrest her or take her children away if she did not testify as a witness against Miller.

Miller's first allegation is easily dismissed.   The Government's decision to inform Borko that she may face perjury charges based on her recanted testimony does not amount to constitutional violation.   This Court recently explained that "it is well within the Executive Branch's power and authority to candidly warn a target of a prosecution that he can be charged with a criminal offense of which the prosecutor is aware and has evidence to support." *Linder*, 2013 WL 812382, at *50.   Such warnings "can even include the candid threat of various

sentences that a target could receive based on the evidence." *Id*; *see also United States v. Hayward*, 5 F.3d 1241, 1256 (7th Cir. 1993) ("As the district court properly noted, there is nothing wrong with the government informing witnesses of the consequences of breaking the law.") (quotation marks omitted), *overruled on other grounds by United States v. Colvin*, 353 F.3d 569 (7th Cir. 2003); *United States v. Bieganowski*, 313 F.3d 264, 292 (5th Cir. 2002) ("[T]he prosecution's comments regarding perjury did not amount to a substantial interference. The prosecution did no more than advise [the witness] that she could be prosecuted if she perjured herself in her testimony …. There is no substantial interference in such a statement."). In this case, Miller fails to present evidence that prosecutors did anything more than inform Borko that she may face perjury charges for recanting her previous sworn testimony. The Court therefore denies Miller's Motion to Dismiss the Indictment to the extent it is based on allegations that prosecutors and law enforcement officials bribed Borko or threatened her with perjury.

Turning to Miller's second and third bases for moving to dismiss the Indictment due to prosecutorial misconduct, the Court finds there is a factual dispute regarding whether Chandra Borko was paid by law enforcement officials in exchange for testimony favorable to the prosecution and whether members of the Waukegan Police Department threatened Borko with arrest and the loss of her children if she did not testify against Miller. Borko's states in her affidavit that she received were provided for the purpose of relocating after being threatened for offering testimony at Miller's first trial. Borko further states that she was told after testifying at trial that she would be "called and paid." Borko's affidavit is consistent with the Government's representation that Borko may have been provided a voucher to terminate her lease after being threatened. However, the Government has also informed the Court that it is unaware of whether Borko was actually paid or what the source of such funds might be. Borko also states

in her affidavit that she testified against Miller because she was scared and that she was told by officers at the Waukegan Police Station that she would be arrested and that her children would be taken away from her if she refused to testify. The affidavit, signed April 8, 2013, directly conflicts with Borko's testimony at Miller's first trial that she was not forced by anyone to provide a statement against him.

Given the fact that Miller offers no evidence of impropriety by local law enforcement other than Borko's affidavit, the Court refuses Miller's invitation to declare a constitutional violation warranting dismissal based solely upon the affidavit of a witness who has offered contradictory testimony. However, taking together Borko's trial testimony, her April 8, 2013 affidavit, her representations during the March 26, 2013 interview with the Government, and the representations made in open court by Miller and the Government, the Court finds there is a factual dispute regarding whether the prosecution engaged in prosecutorial misconduct by either paying or coercing Borko to provide testimony favorable to the Government. Accordingly, the Court will hold an evidentiary hearing before Miller's trial in which Chandra Borko must appear.

## IV.    Motion to Dismiss Count III (Dkt. 252)

In Count III of the indictment, the Government alleges Miller knowingly possessed three firearms in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A). Miller moves to dismiss Count III, arguing there is an insufficient basis for a finder of fact to determine that he had knowledge of a firearm or drugs based on the mere fact that he lived at the residence where the guns and drugs were found. This issue does not "arise anew" on remand and is one Miller could have—but failed to—raise on his appeal before the Seventh Circuit. *Husband*, 312 F.3d at 250–51. Therefore, Miller's challenge to the sufficiency of the allegations supporting Count III of the indictment is waived.

In addition to being waived, Miller's Motion to Dismiss 18 U.S.C. § 924(c) lacks merit. A motion to dismiss an indictment may be brought pursuant to Fed.R.Crim.P. 12(b)(2) where the government, as a matter of law, is incapable of proving beyond a reasonable doubt the charges against the defendant. *See United v. Levin,* 973 F.2d 463, 468 (6th Cir. 1992); *see also United States v. Linder,* No. 12 CR 122, 2013 WL 812382, at *28 (N.D. Ill. Mar. 5, 2013). However, "such dismissals may not be predicated upon the insufficiency of the evidence to prove the indictment's charges." *United States v. DeLaurentis*, 230 F.3d 659, 660–61 (3d Cir. 2000); *see also Levin*, 973 F.2d at 467 ("[D]istrict courts may make preliminary findings of fact necessary to decide questions of law presented by pretrial motions so long as the trial court's conclusions do not invade the province of the ultimate finder of fact."). Furthermore, "[u]nlike in a civil action, a grand jury indictment is generally not subject to dispositive motion practice, and the remedy of dismissal is rarely invoked because it is deemed to be extraordinary." *Linder*, 2013 WL 812382, at *29 (citing *United States v. Li*, 206 F.3d 56, 62 (1st Cir. 2000)).

When considering a motion to dismiss an indictment the Court assumes all of the facts alleged in the indictment as true and views them in the light most favorable to the government. *United States v. Yashar*, 166 F.3d 873, 880 (7th Cir. 1999). Rule 7(c)(1) of the Federal Rules of Criminal Procedure requires that an indictment "be a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed.R.Crim.P. 7(c)(1). "The true test of the sufficiency of the indictment is whether it contains the elements of the offense intended to be charged." *United States v. Senak*, 477 F.2d 304, 306 (7th Cir. 1973) (quoting *Hagner v. United States*, 285 U.S. 427, 431 (1932)). "When grading an indictment's sufficiency, [a court must] look to see whether the document sketches out the elements of the crime and the nature of the charge so that the defendant can prepare a defense and plead double

jeopardy in any future prosecution for the same offense." *United States v. Guerrier*, 669 F.3d 1, 3 (1st Cir. 2011); *see also United States v. Locklear*, 97 F.3d 196, 199 (7th Cir. 1996) ("In general terms, an indictment is sufficient if it first, contains the elements of the charged offense and fairly informs a defendant of the charge against him which he must defend, and second, enables him to plead double jeopardy as a bar to future prosecution." (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974)) (internal quotation marks omitted).

Section 924(c) provides:

Any person who, during and in relation to a crime of violence or drug trafficking crime … for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall… be sentenced to a term of imprisonment of not less than five years.

18 U.S.C. § 924(c)(1)(A). Count III of the indictment against Miller alleges:

On or about April 21, 2008, at Zion, in the Northern District of Illinois, Eastern Division, SHARIFF MILLER, defendant, herein, knowingly possessed a firearm, namely, a Remington Rand Inc., model 1911 A1 U.S. Army, .45 Auto caliber semi-automatic pistol, serial number 1010256, in furtherance of a drug trafficking crime for which he may be prosecuted in a court of the United States, namely, a violation of Title 21, United States Code, Section 841(a)(1), as further set forth in Count One of this Indictment; In violation of Title 18, United States Code, Section 924(c)(1)(A).

(Dkt. 275-3, p. 2.)

This charge is sufficient to sustain an allegation of possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c). Count III alleges that Miller was in (1) possession of (2) a firearm in (3) furtherance of (4) a drug trafficking crime that is (5) prosecutable in a Court of the United States. Thus the Count contains every element of the charged offense. Furthermore, by identifying the specific date of the offense (April 21, 2008) and the model and serial numbers of the firearms Miller is alleged to have possessed, the

Indictment fairly "sketches out … the nature of the charge" so that Miller may "prepare a defense and plead double jeopardy in any future prosecution for the same offense." *Guerrier*, 669 F.3d at 3. Therefore, the Court finds that Count III of the Indictment satisfies the requirements of Rule 7(c)(1).

Miller nevertheless maintains that Count III should be dismissed because he did not "actively employ" or "use" a firearm as required by 18 U.S.C. § 924(c)(1). This argument ignores that Miller is charged with knowingly *possessing* a firearm in furtherance of a drug trafficking crime, not knowingly *using* a firearm. Both offenses are prohibited under section 924(c). Thus, assuming for the purposes of this Motion to Dismiss that the allegations in the Indictment are true, the Court does not find that the Government, as a matter of law, is incapable of proving beyond a reasonable doubt that Miller violated Title 18 U.S.C. § 924(c) by possessing a firearm in furtherance of a drug trafficking crime. Miller's Motion to Dismiss 18 U.S.C., 924(c) is therefore denied.

### V. Motion to Compel Production of Grand Jury Material (Dkt. 259)

Lastly, Miller seeks the production of the following materials from the Grand Jury proceedings in this case: (1) all exculpatory material, if any, presented to the grand jury; (2) all summation or argument presented by any attorney to the grand jury; (3) all documents, testimony, or other items presented to the grand jury; (4) all documents, testimony, or other items relating to the length of the term of the grand jury; (5) an affidavit by each court reporter who transcribed the grand jury proceedings from August 11, 2008 to April 21, 2009; (6) access to grand jury attendance records reflecting the number of jurors present at each meeting; (7) records reflecting the dates the grand jury was in session and how long each session lasted for the period August 11, 2008 to April 21, 2009; and (8) except for the fact witnesses who appeared before the

grand jury, the entire transcript of the August 11, 2008 to April 21, 2009 session that resulted in the Indictment.

Grand jury materials are presumptively secret and subject to disclosure only in extremely limited circumstances. *See* Fed.R.Crim.P. 6(e); *Douglas Oil Co. v. Petro Stops N.W.*, 441 U.S. 211, 222 (1979); *United States v. Puglia*, 8 F.3d 478, 480 (7th Cir. 1993) ("Grand Jury proceedings are cloaked in secrecy."). However, Federal Rule of Criminal Procedure 6(e)(3)(E)(ii) allows disclosure of grand jury proceedings "at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." A party seeking to breach grand jury secrecy must demonstrate compelling necessity. *See Matter of EyeCare Physicians of America*, 100 F.3d 514, 518 (7th Cir. 1996); *Hernly v. United States*, 832 F.2d 980, 983–84 (7th Cir. 1987). Specifically, the party must make a showing of particularized need that "the information 'is needed to avoid a possible injustice in another judicial proceeding, that the need for disclosure is greater than the need for continued secrecy, and that the request is structured to cover only material so needed.' " *United States v. Campbell*, 324 F.3d 497, 498–99 (7th Cir. 2003) (quoting *Douglas Oil Co.*, 441 U.S. at 22); *see also United States v. Sells Eng'g, Inc.*, 463 U.S. 418, 443 (1983)). In deciding whether a party has made such a showing, "the district court has 'substantial discretion.' " *Hernly*, 832 F.2d at 984 (quoting *Douglas Oil*, 441 U.S. at 222–23).

Miller attempts to support his Rule 6(e) motion for disclosure of grand jury material by making several broad and unsupported allegations of prosecutorial misconduct. First, Miller alleges that prosecutors "suppressed exculpatory evidence" during the grand jury proceedings leading to his indictment. However, it is well-established that the government is not required to present exculpatory evidence to a grand jury, and a district court cannot dismiss an indictment on

that basis. *United States v. Williams*, 504 U.S. 36, 55 (1992); *see also United States v. Mahalick*, 498 F.3d at 475, 480 (7th Cir. 2007) ("[T]he grand jury is an accusatory, rather than an adjudicatory, body, and so the disclosure of exculpatory evidence is not required."). Thus the Court denies Miller's motion to the extent it seeks grand jury material to support dismissal based on the government's alleged failure to present exculpatory evidence.

Next, Miller alleges that prosecutors knowingly presented perjured evidence to the grand jury. Unlike the case with exculpatory evidence, "[t]he government's knowing use of false testimony [during grand jury proceedings] violates due process." *United States v. Useini*, 516 F.3d 634 (7th Cir. 2008) (citing *United States v. Burke*, 425 F.3d 400, 412 (7th Cir. 2005)). "For an indictment to be dismissed on account of false testimony presented to the grand jury, the defendant must show prejudice amounting to either 'proof that the grand jury's decision to indict was substantially influenced, or that there is 'grave doubt' that the decision to indict was substantially influenced, by testimony which was inappropriately before it." *Id.* (citations omitted). Here, Miller does not point to any evidence in the record suggesting prosecutors knowingly presented perjured testimony to the grand jury. Miller's attempt to rely upon the affidavits of Chandra and Renee Borko is misplaced. Based upon the of the Government's March 26, 2013 interview with Chandra Borko and her April 8, 2013 affidavit, it is clear that Chandra Borko only recently recanted her previous testimony. Even if Chandra Borko committed perjury when testifying in front of the grand jury, there is no indication that prosecutors were aware of the fact at the time. Renee Borko's July 24, 2012 affidavit fails to support Miller's claim for similar reasons. Renee Borko states in her affidavit that she never saw Miller with a gun at her birthday party in February 2008. (Dkt. 263, p. 7.) Once again, however, even if Renee Borko committed perjury by testifying otherwise before the grand jury,

Miller offers no evidence to support his contention that the Government was aware Renee Borko's testimony was false. Thus the Court rejects Miller's second basis for the release of grand jury material.

Finally, Miller alleges that prosecutors engaged in misconduct by making inflammatory, unfair, and legally inaccurate statements during the grand jury proceedings. However Miller fails to present any basis for this allegation aside from his own belief that his indictment was the result of "obviously unfair and biased presentation." "Mere unsupported speculation of possible prosecutorial abuse does not meet the particularized need standard." *United States v. Canino*, 949 F.2d 928, 943 (7th Cir. 1996); *see also United States v. Edelson*, 581 F.2d 1290, 1291 (7th Cir. 1978) (no particularized need because the defendant "offered nothing more than unsupported speculation," failing to "[point] to anything in the record which [sic] might suggest that the prosecution engaged in improper conduct before the grand jury"); *see also United States v. Perez*, 67 F.3d 1371, 1381 (9th Cir. 1995) (finding no particularized need where "the defendant alleged no facts in support of his claim"), *withdrawn in part on other grounds,* 116 F.3d 840 (9th Cir. 1997). Accordingly, because Miller has not presented evidence to support his allegation of prosecutorial misconduct during the grand jury proceedings, the Court finds that Miller has failed to make a particularized showing that the materials contained in his request are needed to avoid a possible injustice in another judicial proceeding. Miller's Motion to Compel Production of Grand Jury Material is therefore denied.[6] The Government will be obligated to turn over only those materials required to satisfy its *Brady* and *Giglio* obligations.

---

[6] This holding does not limit the Government's obligation to provide those materials required pursuant to its obligations under *Brady* and *Giglio*.

## CONCLUSION AND ORDER

For the reasons stated, the Court denies Miller's Motion for a *Franks* hearing, Motion to Dismiss 18 U.S.C. 924(c), Motion for Disclosure of Confidential Informer, Motion to Suppress Evidence and to Order an Evidentiary Hearing, and Motion to Compel Production of Grand Jury Material. Miller's Motion to Dismiss the Indictment on Grounds of Prosecutorial, Government and Local Officer Misconduct is taken under advisement pending a factual hearing to determine whether local law enforcement officers coerced Chandra Borko to testify in a manner favorable to the Government.

_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: